Argued and submitted February 12, affirmed April 23, 2014

STATE ex rel Gary SCHRODT,
*Relator-Respondent,*

*v.*

JACKSON COUNTY,
a political subdivision of the State of Oregon,
*Defendant,*

*and*

Harold HARDESTY,
*Adverse Party-Appellant.*

Jackson County Circuit Court
111620Z3; A149291

324 P3d 615

Eugene V. Anderson argued the cause for appellant. With him on the briefs was Davis, Hearn, Bridges & Anderson.

Mark S. Bartholomew argued the cause for respondent. With him on the brief were Ryan J. Vanderhoof and Hornecker, Cowling, Hassen & Heysell, L.L.P.

Before Duncan, Presiding Judge, and Wollheim, Judge, and Lagesen, Judge.

LAGESEN, J.

## LAGESEN, J.

The trial court entered a judgment granting mandamus relief to respondent Gary Schrodt under ORS 215.429.[1] The judgment ordered Jackson County (the county) to approve Schrodt's land use application, which requested that the county broaden the categories of commercial uses permitted on Schrodt's residentially zoned property. Schrodt's neighbor, appellant Harold Hardesty, who intervened below, appeals that judgment, raising two primary issues: (a) whether Schrodt's application is the type of application for which ORS 215.429 authorizes mandamus relief, and (b) if so, whether the trial court erred when it concluded that the approval of the application would not violate any substantive provision of the Jackson County Land Development

---

[1] ORS 215.429 provides:

"(1) Except when an applicant requests an extension under ORS 215.427, if the governing body of the county or its designee does not take final action on an application for a permit, limited land use decision or zone change within 120 days or 150 days, as appropriate, after the application is deemed complete, the applicant may file a petition for a writ of mandamus under ORS 34.130 in the circuit court of the county where the application was submitted to compel the governing body or its designee to issue the approval.

"(2) The governing body shall retain jurisdiction to make a land use decision on the application until a petition for a writ of mandamus is filed. Upon filing a petition under ORS 34.130, jurisdiction for all decisions regarding the application, including settlement, shall be with the circuit court.

"(3) A person who files a petition for a writ of mandamus under this section shall provide written notice of the filing to all persons who would be entitled to notice under ORS 197.763 and to any person who participated orally or in writing in any evidentiary hearing on the application held prior to the filing of the petition. The notice shall be mailed or hand delivered on the same day the petition is filed.

"(4) If the governing body does not take final action on an application within 120 days or 150 days, as appropriate, of the date the application is deemed complete, the applicant may elect to proceed with the application according to the applicable provisions of the county comprehensive plan and land use regulations or to file a petition for a writ of mandamus under this section. If the applicant elects to proceed according to the local plan and regulations, the applicant may not file a petition for a writ of mandamus within 14 days after the governing body makes a preliminary decision, provided a final written decision is issued within 14 days of the preliminary decision.

"(5) The court shall issue a peremptory writ unless the governing body or any intervenor shows that the approval would violate a substantive provision of the county comprehensive plan or land use regulations as those terms are defined in ORS 197.015. The writ may specify conditions of approval that would otherwise be allowed by the county comprehensive plan or land use regulations."

Ordinance (JCLDO). We affirm, concluding that (a) Schrodt's application qualifies as an "application for a permit" within the meaning of ORS 215.429 and, thus, is subject to the mandamus procedures authorized by that statute; and (b) Hardesty's failure to provide this court with the transcript of the trial court's evidentiary hearing on the petition precludes review of whether the trial court erred in determining that Hardesty had not proved that approval of Schrodt's application would violate substantive provisions of the JCLDO.

## I.  BACKGROUND

Schrodt owns 2.39 acres of land in Jackson County. The land is zoned Rural Residential-5 (RR-5) and is located just outside the urban growth boundary of Ashland. In 1990, Schrodt obtained a Conditional Use Permit (CUP), issued under the county's previous land development ordinance. The CUP authorized Schrodt to manufacture and sell bird feeders on his property, notwithstanding its residential zoning. Pursuant to the CUP, Schrodt constructed a 21,000-square-foot warehouse in which to conduct his bird-feeder business.[2] He sold the business in 2005, and the new owner transferred the business out of state, leaving Schrodt with an empty warehouse.

Schrodt wanted to lease the warehouse for other commercial uses, so he consulted with the county planning department to determine what other commercial uses would be authorized on the property under the 1990 CUP and the JCLDO. The then-planning manager suggested that Schrodt submit an application for a written interpretation of the JCLDO under JCLDO 3.9.[3] Specifically, the planning

---

[2] Schrodt also owns a smaller building on the land, a historic slaughterhouse. Pursuant to county-issued permits, the historic slaughterhouse is used for recreational and educational activities, including dance. The use of the historic slaughterhouse, and the permits related to it, are not at issue in this proceeding.

[3] The version of JCLDO 3.9 in effect at the time, JCLDO 3.9 (eff 2/13/2005), provided:

"An application for written interpretation of this ordinance will be processed under the Type 2 procedures of Section 3.1.3 with the following modifications:

"The Planning Director's interpretation will be in writing, and a copy will be provided to the applicant and parties entitled to notice of the decision. The Director's interpretation will thereafter be binding in relation to the specific

manager recommended that Schrodt request a written interpretation of JCLDO 6.2.3 and JCLDO 6.3.3, the provisions governing the approval of "unlisted uses" in a zoning district.

In January 2006, Schrodt, through an agent, submitted the application suggested by the planning manager. In accordance with the planning manager's suggestion, Schrodt denominated the application as an "Application for Written Interpretation of Unlisted Uses LDO Sections 3.9, 6.2.3 and 6.3.3" and used the planning department's designated form for "Type 2 Review: Written Interpretation, Unlisted Uses." Rather than completing the form, Schrodt attached a 19-page typewritten document explaining what he was asking the planning director to decide. In that document, Schrodt explained that his objective was "to establish an administrative procedure whereby * * * new uses can be evaluated." The application noted that the existing CUP was specific to Schrodt's bird-feeder business, and that Schrodt's goal was to broaden that approval to encompass other uses similar in scope to the bird-feeder operations "to make it possible for new tenants to assume occupancy in a timely manner by contacting the County, providing a brief description of their business, obtaining agreement that their use is no more 'intense' than the current use, and agreeing to comply with conditions of this interpretation and previous approvals." The application identified a number of categorical uses that, in Schrodt's view, were similar enough in scope to the bird-feeder business that the county should interpret the JCLDO and the existing CUP to authorize those uses, subject only to a ministerial review by the county of a specific proposed use.

In May 2006, the Jackson County Planning Division (planning division), through its planning manager—a different planning manager than the one who had advised Schrodt as to what type of application to submit—issued a preliminary partial approval of the application, with certain

matter presented by the applicant, and will have no other binding or precedential effect. The record of interpretations will be kept in the Planning Department and will be available for public inspection during normal business hours. Appeal of the Director's Interpretation will be to the Board of Commissioners in accordance with Table 2.1-1."

conditions. In that decision, the planning manager observed that, in requesting an interpretation of the unlisted uses provisions of the JCLDO, Schrodt (and, evidently, the previous planning manager) had "misconstrued" that provision "and applied [it] in a way not intended by the code." The planning manager concluded that "the nature of the review is more appropriately oriented toward a Land Use Interpretation of how similar (not unlisted) uses can be accommodated on the site," and that, as a result, "the application [was] best reviewed under the Non-Conforming Use provisions of the code," namely, JCLDO chapter 11 (eff 2/13/2005). Viewing the application in that manner, the planning manager concluded that Schrodt could use the warehouse for some, but not all, of the commercial purposes identified in the land use application, subject only to a ministerial review by the county. Specifically, the planning manager concluded:

"The applicant is approved for uses similar to those which have already been approved for the warehouse and historical abattoir building and are otherwise considered low impact activities associated with the zoning district as defined in the following conditions:

"1. The following uses are allowed in the Warehouse through a Type 1 (LUI or SPR) Review, subject to other conditions established in this decision:

"Industrial Service - low impact as defined by the LDO (Land Development Ordinance).

"Manufacturing/Production - low impact as defined by the LDO.

"Business & Professional Offices[2]

"Processing of timber & forest products

"Firewood processing & sales

"Service and Repair Businesses (excluding repair and services of motor vehicles)[2]

"Emergency medical center

"Medical/dental/optical clinic

"Studio: broad-casting/recording

"Recreation/sports club, private

"2.   Other uses not listed in Condition #1 or not already
allowed through prior approvals must be processed through
an Alteration of a Non-Conforming Use review. Traffic
Stud[ies] may be required dependent on requested use.

_____

"2 Not to exceed 3,000 square feet or comparable amount
as defined in the approved historic floorplan."

(Emphases omitted.)

Hardesty appealed that decision. The planning divi-
sion transmitted the appeal to the county hearings officer.
The hearings officer ultimately concluded that the appeal was
"not properly before the Hearings Officer" because JCLDO
3.9, governing written interpretations, specifies that inter-
pretive rulings are appealed to the Jackson County Board of
Commissioners, not to the county hearings officer. The hear-
ings officer ordered the appeal "returned to the Planning
Division for referral to the Board of Commissioners."

For reasons not apparent from the record, the
planning division waited more than four years to transmit
the appeal to the board of commissioners. As a result, the
county failed to render a final decision on Schrodt's applica-
tion within the timelines specified by statute. Shortly after
the planning division transmitted the appeal to the board of
commissioners, Schrodt initiated this mandamus proceed-
ing under ORS 215.429, seeking to compel the approval of
his land use application. Hardesty intervened. The county
declined to take a position on whether the writ should issue.
The county admitted that it had not taken final action on
Schrodt's application within the statutory time frame, and
asserted ambivalence as its position on the record regard-
ing the proper outcome of the case: "The County is caught
in the middle with regard to this neighbor dispute, and it
will allow the two primarily interested parties to carry most
of the burden of presenting evidence and argument to the
Court."

Following a hearing, the trial court granted man-
damus relief. The court concluded that Schrodt's application
for a planning director's interpretation under JCLDO 3.9
constituted a permit within the meaning of ORS 215.429,
thus empowering the court to grant mandamus relief upon

the county's failure to timely render a final decision on the application. The court then found, based on the "expert witness testimony and corroborating evidence" presented by the parties, that Hardesty "ha[d] not met [his] burden of showing that a substantive violation of the JCLDO would result from the approval of [Schrodt's] JCLDO 3.9 application." In particular, the trial court found affirmatively that the evidence demonstrated that the new commercial uses proposed by Schrodt "will not have [a] 'greater adverse impact on the surrounding neighborhood,'" as required by JCLDO 11.2.1 for the approval of an alteration of nonconforming uses. (Quoting JCLDO 11.2.1(A).)[4]

Hardesty timely appealed. On appeal, he assigns error to the trial court's decision to issue the writ, contending that the court erred in three respects: (a) by concluding that Schrodt's application was eligible for the mandamus remedy authorized by ORS 215.429; (b) by concluding that Hardesty failed to prove that approval of Schrodt's application would not violate any substantive provision of the JCLDO; and (c) by granting mandamus relief where the process established by ORS 215.429 is "unfair."

## II. STANDARD OF REVIEW

The issue on appeal is whether the trial court correctly interpreted ORS 215.429 when it concluded that Schrodt's application is subject to the mandamus procedures established by that statute. We review the trial court's interpretation of a statute for legal error. *State v. Spainhower*, 251 Or App 25, 27, 283 P3d 361 (2012).

## III. ANALYSIS

As noted, Hardesty raises three distinct challenges to the trial court's decision to grant mandamus relief. In the first assignment of error, he contends that Schrodt's application is not the type of application for which ORS 215.429 authorizes mandamus relief, and that the trial court should have dismissed the case on that basis. In the second and

---

[4] JCLDO 11.2.1(A) (eff 2/13/2005) states, in pertinent part:

"Applications to change a nonconforming use to another, no more intensive nonconforming use * * * must show that the proposed new use will have no greater adverse impact on the surrounding neighborhood."

third assignments of error, he contends that the trial court's determination that Hardesty had not proved that the approval of the application would violate any substantive provisions of the JCLDO is wrong on the merits for a variety of reasons. Finally, in the fourth and fifth assignments of error, Hardesty assigns error to the trial court's decision on the ground that the mandamus process created by ORS 215.429 is "unfair" and improperly shifts the burden of enforcing the JCLDO from the county to citizens such as Hardesty.

Working backwards through Hardesty's assignments of error, we reject the fourth and fifth assignments without discussion. The arguments in those assignments of error, which contest the wisdom and fairness of the legislative choices reflected in ORS 215.429, but do not assert that those legislative choices contravene the state or federal constitution, are properly directed to the legislature, not the courts.

We also decline to address Hardesty's second and third assignments of error. In both of those assignments, Hardesty challenges the trial court's determination that he failed to prove that the approval of Schrodt's application would violate substantive provisions of the JCLDO. Those challenges are not reviewable on appeal because Hardesty has not provided us with an adequate record on which to review them. ORS 19.250(1)(e); *Ferguson v. Nelson*, 216 Or App 541, 549, 174 P3d 620 (2007) ("An appellant bears the burden of providing a record sufficient to demonstrate that error occurred."). Specifically, Hardesty has not provided this court with a transcript of the trial court's evidentiary hearing on the mandamus petition. As a result, we do not have access to all of the evidence on which the trial court based its determination that Hardesty had not demonstrated that the approval of the application would violate substantive provisions of the JCLDO. Without the entirety of the evidentiary record before the trial court, we have no basis for concluding that the court erred. The determination made by the trial court was not purely legal but, instead, required the court to make factual determinations regarding the likely impacts of approving the uses of the warehouse proposed by Schrodt—factual determinations that are unreviewable

in the absence of the full evidentiary record on which they were made.

The remaining question before us, therefore, is the one presented by Hardesty's first assignment of error: whether Schrodt's application is the type of application for which ORS 215.429 authorizes mandamus relief. That is, is Schrodt's application, as he contends, an "application for a permit" within the meaning of ORS 215.429(1)? It is.

ORS 215.402(4) defines "permit" for purposes of ORS 215.429(1). It states:

> "[U]nless the context requires otherwise: *** 'Permit' means discretionary approval of a proposed development of land under ORS 215.010 to 215.311, 215.317, 215.327 and 215.402 to 215.438 and 215.700 to 215.780 or county legislation or regulation adopted pursuant thereto."

ORS 215.402(4). In the land use context, "the term 'discretion' and its derivatives refer to a decision that requires the application of judgment or some form of evaluation, as distinct from 'nondiscretionary' decisions that can be made solely by reference to objective criteria." *Buckman Community Assn. v. City of Portland*, 168 Or App 243, 245 n 1, 5 P3d 1203 (2000).[5] As we previously have recognized, a nonministerial decision—that is, a decision that is not dictated by "clear and objective standards"—to allow a particular proposed use of land that otherwise would not be allowed on a particular property qualifies as a "permit" under ORS 215.402(4). *Doughton v. Douglas County*, 88 Or App 198, 201-02, 744 P2d 1299 (1987).[6]

---

[5] *Buckman Community Assn.* addressed the meaning of the word "discretion" for purposes of ORS 227.160(2), which, for our purposes, defines "permit" identically to ORS 215.402(4). ORS chapter 227 governs land use decisions by cities; ORS chapter 215 governs land use decisions by counties. We have recognized that our decisions regarding the statutory provisions governing city land use decisions are probative of the proper interpretation of analogous statutory provisions governing county land use decisions. *See State ex rel Oregon Pipeline v. Clatsop County*, 253 Or App 138, 142-43, 288 P3d 1024 (2012), *rev den*, 353 Or 428 (2013) (looking to our case law construing *former* ORS 227.178(7) (1983), *renumbered as* ORS 227.179 (1999), to construe ORS 215.429 because it is "the analog of ORS 215.429 that applies to city governments").

[6] The Land Use Board of Appeals (LUBA) has similarly interpreted the term "permit" in ORS 215.402(4), relying, in part, on our decision in *Doughton*. *Tirumali v. City of Portland*, 41 Or LUBA 231, 240 (2002) (explaining that an approval of a proposed use of land typically constitutes a "permit" under ORS

Here, the county approval requested by Schrodt falls easily within the statutory definition of a "permit" as we (and LUBA) have construed that term in ORS 215.402(4) and its analog, ORS 227.160(2). Schrodt's application requested that the county issue an interpretive ruling approving a change in the use of his residentially zoned property from one previously approved nonconforming use (bird-feeder manufacturing) to a broad range of nonconforming uses. As the trial court correctly recognized, the decision whether to grant that approval would require the county to exercise discretion (as that word is understood in the land use context) because it would require the county to evaluate the impact on neighboring properties of changing from the bird-feeder operation to another commercial use. JCLDO 11.2.1(A) (eff 2/13/2005) (authorizing change in nonconforming use upon showing "that the proposed new use will have no greater adverse impact on the surrounding neighborhood").

In addition, Schrodt's application sought approval for a "proposed development of land" because it proposed a change in the use of the land. That is, Schrodt's application made clear that his objective was to make his land useable and available for different nonconforming commercial uses. Although ORS chapter 215 does not define "development," one ordinary definition of "development"—both at the time ORS 215.402 was enacted and now—is "a making useable or available." *Webster's Third New Int'l Dictionary* 618 (unabridged ed 1971); *see also Webster's Third New Int'l Dictionary* 618 (unabridged ed 2002). That definition of development—with its focus on use—accords with the context of ORS 215.402. For example, ORS 215.402(4) refers to the approval of a "proposed development of land *under ORS 215.010 to 215.311.*" (Emphasis added.) ORS 215.296, in turn, supplies the standards for authorizing particular *uses* of land zoned for farm use, demonstrating that a request for an approval of a "proposed development of land" necessarily includes a request for permission to engage in particular use of the land.

---

227.160 or ORS 215.402 "where there is some question as to the nature of the proposed use or whether the use is permitted at all in the zone"); *Pienovi v. City of Canby,* 16 Or LUBA 604, 606 (1998) (nonconforming use determination is a permit).

Further, although it does not supply the definition of "development" for purposes of ORS chapter 215, ORS 227.215— which defines "development" in the context of describing the land use ordinances that cities are permitted to enact— indicates that the word "development" in Oregon's land use laws encompasses the concept of a change in the use of land, like the change in use proposed by Schrodt. Specifically, ORS 227.215(1) defines "development," in pertinent part, as "making a material change in the use or appearance of a structure or land, dividing land into two or more parcels * * * and creating or terminating a right of access."

Finally, we, too, previously have recognized that, to constitute an "approval of a proposed development of land," a land use decision ordinarily must involve some decision regarding "permissible or permitted uses of the land." *Clark v. City of Albany*, 142 Or App 207, 210-12, 921 P2d 406 (1996). In *Clark*, we addressed whether an application for annexation constituted an application for a "permit" under ORS 227.160(2), that is, an application for "discretionary approval of a proposed development of land." *Id.* at 210. We concluded that it did not, because annexation "does not encompass 'development' of the land *or any other particular decision as to the specific uses to which the land may be put.*" *Id.* at 211 (emphasis added).

In summary, the text and context of ORS 215.402(2) reflect that the legislature intended the phrase "application for discretionary approval of a proposed development of land" to include requests for discretionary approval of a proposed use of land, such as the request by Schrodt to broaden the categories of commercial uses permitted on his land. Hardesty does not identify any text or context that suggests a different legislative intent. Nonetheless, he asserts that Schrodt's application is not an application for the "development" of land because it requests approval of different land *uses*. In making that argument, Hardesty relies solely on the definitions of "development" and "use" contained in the JCLDO.[7] He asserts that because the JCLDO defines

---

[7] The JCLDO defines "development" as,

"Any man-made change to improved or unimproved real estate, including but not limited to buildings or other structures, mining, dredging, filling,

"development" differently from "use," a request for the discretionary approval of a proposed *use* of land does not qualify as a request for "discretionary approval of a proposed *development* of land" under ORS 215.429. (Emphasis added.)

Hardesty's argument fails because we do not look to the JCLDO to determine what the legislature meant by the word "development" in ORS 215.429. Instead, we look to the text and context of ORS 215.429. *Clark*, 142 Or App at 210. As explained above, that text and context demonstrate that the legislature intended the term "proposed development of land" to encompass a proposed change in use of the land.

Hardesty advances two additional arguments as to why the mandamus procedures of ORS 215.429 should not apply to Schrodt's application. We are not persuaded by either. Hardesty first argues that a decision on Schrodt's application would qualify as a "land use decision" as defined by ORS 197.015(10)(b)(A), and that ORS 197.825 gives LUBA the exclusive jurisdiction to review land use decisions. He asserts that the fact that LUBA has exclusive jurisdiction to review land use decisions precludes a grant of mandamus relief. But the fact that LUBA would have had jurisdiction to review the county's decision on Schrodt's application, had the county made a final decision on that application, is beside the point. The problem here is that the county did not make a timely final decision on Schrodt's application, and, thus, there was never any final land use decision for LUBA to review. As we recently explained, "The mandamus remedy 'is not designed to provide review of a local government's land use decisions,' but instead, provides 'an incentive for timely governmental action, along with a remedial mechanism that results in an approval' subject to defenses that the local government must prove." *State ex rel Oregon Pipeline v. Clatsop County*, 253 Or App 138, 142-43, 288 P3d 1024 (2012), *rev den*, 353 Or 428 (2013) (quoting *State ex rel*

---

grading, paving, excavation or drilling operations or storage of equipment and materials."

JCLDO 13.3(62) (eff 2/13/2005). The JCLDO defines "use" as,

"The purpose for which land, accessways, buildings or structures are designed, arranged, or intended, or for which a building or structure is occupied or maintained, whether on a permanent or temporary basis."

JCLDO 13.3(283) (eff 2/13/2005).

*Compass Corp. v. City of Lake Oswego,* 319 Or 537, 542, 544, 878 P2d 403 (1994)).

Hardesty also argues that ORS 215.429 authorizes a trial court to order a county to take ministerial actions only. Because the approval of Schrodt's permit application requires the exercise of discretion, Hardesty reasons that it is not subject to the statutory mandamus procedures. That argument fails because it is contrary to the terms of ORS 215.402 and ORS 215.429, which plainly authorize a trial court to order a county to approve an application for a "discretionary approval of a proposed development of land." ORS 215.429 (authorizing court to order county to approve a "permit" application); ORS 215.402(4) (defining "permit" as a "discretionary approval of a proposed development of land"). Indeed, we previously have recognized that the precise effect of the mandamus remedy provided by ORS 215.429 (with respect to counties) and ORS 227.179 (with respect to cities) is to convert what otherwise would have been a discretionary land use decision for a local government into a mandatory approval when the local government does not timely make a final decision. *State ex rel Compass Corp. v. City of Lake Oswego,* 135 Or App 148, 151 n 1, 898 P2d 198 (1995). In *State ex rel Compass Corp.,* we explained that, under *former* ORS 227.178(7)[8] (the analog of ORS 215.429 applicable to cities), a city "loses [its] discretion entirely" to approve or deny a permit when the city fails to timely act, and that, once a city fails to act on a permit application within statutory timelines, "the city *must* approve the application unless it can be demonstrated that approval would violate the comprehensive plan or some other specified land use regulations." *Id.* (emphasis in original). Accordingly, Hardesty's arguments provide no basis for concluding that the trial court erred when it concluded that Schrodt's land

[8] Both ORS 215.428(7), providing mandamus relief following a county's failure to act, and ORS 227.178(7), providing mandamus relief following a city's failure to act, had, for all practical purposes, identical wording. Both were renumbered and amended by Oregon Laws 1999, chapter 533 sections 7 and 10, respectively. The current statutes, ORS 215.429, relating to counties, and ORS 227.179, relating to cities, continue to have, for all practical purposes, identical wording. This court has previously held the statutes to be analogous, and the current statutes to be "substantially identical" to the former statutes. *State ex rel Oregon Pipeline,* 253 Or App at 142-43.

use application is subject to the mandamus procedures authorized by ORS 215.429.

## IV. CONCLUSION

Schrodt's application for approval to change the commercial uses in which his warehouse can be employed constitutes an "application for a permit" within the meaning of ORS 215.429. As a result, because the county failed to render a final decision on that application within the statutory time frame, Schrodt was entitled to seek mandamus relief under ORS 215.429, and the trial court was empowered to grant that relief.

Affirmed.