Argued and submitted October 4, affirmed December 15, 2021

## Stanley ROBERTS
## and Rebecca Roberts,
*Petitioners,*

*v.*

## CITY OF CANNON BEACH;
## Haystack Rock, LLC; and
## Oregon Coast Alliance,
*Respondents.*

## Land Use Board of Appeals
## 2020116; A176601

504 P3d 1249

Petitioners seek judicial review of a decision of the Land Use Board of Appeals (LUBA) affirming the City of Cannon Beach's denial of their application for a development permit to construct a residence. Petitioners raise two assignments of error in which they argue that LUBA's decision is unlawful in substance because it affirms the city's application of the oceanfront setback established in Cannon Beach Municipal Code section 17.42.050(A)(6) to their application. *Held*: The oceanfront setback is a clear and objective standard, ORS 197.307(4), and ORS 227.175(4)(c) and (e) did not prohibit application of the oceanfront setback to petitioners' application.

Affirmed.

W. Michael Gillette argued the cause for petitioners. Also on the brief were Schawabe Williamson & Wyatt, P.C., and Wendie L. Kellington, and Kellington Law Group, PC.

William K. Kabeiseman argued the cause for respondent City of Cannon Beach. Also on the brief were Carrie A. Richter and Bateman Seidel Miner Blomgren Chellis & Gram, P.C.

William L. Rasmussen argued the cause for respondent Haystack Rock, LLC. Also on the brief were Steven G. Liday and Miller Nash, LLP.

Sean Malone filed the brief for respondent Oregon Coast Alliance.

Bryan W. Cavaness filed the brief *amicus curiae* for Stafford Land Company.

James D. Howsley filed the brief *amicus curiae* for Home Builders Association of Metropolitan Portland. Also on the brief was Jordan Ramis, PC.

Patricia M. Mulvihill filed the brief *amicus curiae* for League of Oregon Cities.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Aoyagi, Judge.

ARMSTRONG, P. J.

Affirmed.

## ARMSTRONG, P. J.

Petitioners seek judicial review of a decision of the Land Use Board of Appeals (LUBA) affirming the City of Cannon Beach's denial of their application for a development permit to construct a residence. Petitioners raise two assignments of error in which they argue that LUBA's decision is unlawful in substance because it affirms the city's application of the oceanfront setback established in Cannon Beach Municipal Code (CBMC) section 17.42.050(A)(6) to their application.[1] As explained below, we conclude that the oceanfront setback is a clear and objective standard, ORS 197.307(4), and that ORS 227.175(4)(c) and (e) do not prohibit application of the oceanfront setback to petitioners' application. Accordingly, we affirm.

We begin by considering petitioners' first assignment of error. Before recounting the facts, we set out the relevant code provisions, which we take from LUBA's opinion:

"The purpose of the [oceanfront management (OM)] overlay zone

"'is to regulate uses and activities in the affected areas in order to: ensure that development is consistent with the natural limitations of the oceanshore; to ensure that identified recreational, aesthetic, wildlife habitat and other resources are protected; to conserve, protect, where appropriate develop, and where appropriate restore the resources and benefits of beach and dune areas; and to reduce the hazards to property and human life resulting from both natural events and development activities.' Cannon Beach Municipal Code (CBMC) 17.42.010.

"The OM overlay zone includes all 'lots abutting the oceanshore.' CBMC 17.42.020(A)(1). '"Lot abutting the oceanshore" means a lot which abuts the Oregon Coordinate Line or a lot where there is no buildable lot between it and the Oregon Coordinate Line.' CBMC 17.04.320. CBMC 17.42.050(A)(6) provides the oceanfront setback standard

---

[1] *Amici* Stafford Land Company and Homebuilders Association of Metropolitan Portland have filed briefs further addressing the assignments of error raised by petitioners. Because the three briefs present overlapping arguments, we do not distinguish among them for purposes of this opinion. Generally, we refer to the arguments raised by petitioners and their supporting *amici* as petitioners' arguments.

for lots abutting the oceanshore, establishing the 'ocean yard.' '"Ocean yard" means a yard measured horizontally at right angles from the most easterly of [the] Oregon Coordinate Line or the western property line, to the nearest point of a building. An ocean yard may be a front yard, a rear yard or a side yard.' CBMC 17.04.578. The only structures permitted in the ocean yard are fences, decks, or beach access stairs. CBMC 17.42.060(A)(9). Accordingly, a dwelling cannot be constructed in the ocean yard.

"The oceanfront setback and resulting ocean yard established by CBMC 17.42.050(A)(6) are at the center of the city's denial and petitioners' arguments in this appeal. CBMC l 7.42.050(A)(6) provides:

"'Oceanfront Setback. For all lots abutting the oceanshore, the ocean yard shall be determined by the oceanfront setback line.

"'a.   The location of the oceanfront setback line for a given lot depends on the location of buildings on lots abutting the oceanshore in the vicinity of the proposed building site and upon the location and orientation of the Oregon Coordinate Line.

"'b.   For the purpose of determining the oceanfront setback line, the term "building" refers to the residential or commercial structures on a lot. The term "building" does not include accessory structures.

"'c.   The oceanfront setback line for a parcel is determined as follows:

"'i.   Determine the affected buildings; the affected buildings are those located one hundred feet north and one hundred feet south of the parcel's side lot lines.

"'ii.   Determine the setback from the Oregon Coordinate Line for each building identified in subsection (A)(6)(c)(i) of this section.

"'iii.   Calculate the average of the setbacks of each of the buildings identified in subsection (A)(6)(c)(ii) of this section.

"'d.   If there are no buildings identified by subsection (A)(6)(c)(i) of this section, then the oceanfront setback line shall be determined by buildings that are located two hundred feet north and two hundred feet south of the parcel's side lot lines.

"'e.   Where a building identified by either subsection (A)(6)(c)(i) of this section or subsection (A)(6)(d) of this section extends beyond one hundred feet of the lot in question, only that portion of the building within one hundred feet of the lot in question is used to calculate the oceanfront setback.

"'f.   The setback from the Oregon Coordinate Line is measured from the most oceanward point of a building which is thirty inches or higher above the grade at the point being measured. Projections into yards, which conform to Section 17.90.070, shall not be incorporated into the required measurements.

"'g.   The oceanfront setback line shall be parallel with the Oregon Coordinate Line and measurements from buildings shall be perpendicular to the Oregon Coordinate Line.

"'h.   The minimum ocean yard setback shall be fifteen feet.

"'i.   Notwithstanding the above provisions, the building official may require a greater oceanfront setback where information in a geologic site investigation report indicates a greater setback is required to protect the building from erosion hazard.

"'j.   As part of the approval of a subdivision, the city may approve the oceanfront setback for the lots contained in the subdivision. At the time of building construction, the oceanfront setback for such a lot shall be the setback established by the approved subdivision and not the oceanfront setback as it would be determined by subsections (A)(6)(a) through (i) of this section. Before granting a building permit, the building official shall receive assurance satisfactory to such official that the location of the oceanfront setback for said lot has been specified at the required location on the plat or has been incorporated into the deed restriction against the lot.'"

*Roberts v. City of Cannon Beach*, ___ Or LUBA ___, ___ (LUBA No. 2020-116, July 23, 2021) (slip op at 7-10) (brackets in LUBA opinion; internal footnotes omitted).

The subject property is a 5,394-square-foot lot on a steep hillside facing the Pacific Ocean in the Tolovana Park subdivision. Petitioners submitted an application to construct a new 2,712-square-foot residence on the property.

The city determined that petitioners' lot and the lot immediately to the north of petitioners' lot were both "lots abutting the oceanshore," CBMC 17.42.020(A)(1), and, consequently, that the oceanfront setback, CBMC 17.42.050(A)(6), applied. The city determined that the required method of determining the oceanfront setback was, as set out in CBMC 17.42.050(A)(6)(c), to identify the "affected buildings" and average the oceanfront setbacks of those buildings. The city determined that, in this case, there was only one affected building, the house on the lot to the north of petitioners' lot. Applying CBMC 17.42.050(A)(6)(c), the city averaged the setbacks of the "affected buildings" and concluded that the average was the same as the setback of the single affected building.

Ultimately, the city denied the permit on the ground that petitioners' proposed house did not comply with the oceanfront setback. Petitioners challenged the denial before LUBA, and LUBA affirmed the denial. On judicial review, petitioners contend that LUBA's decision is unlawful in substance because LUBA misapplied the statutory requirement that approval standards for housing be "clear and objective." ORS 197.307(4).[2]

We review LUBA's construction of a statute for legal error. *Central Oregon LandWatch v. Deschutes County*, 285 Or App 267, 276-77, 396 P3d 968 (2017). As explained below, we reject petitioners' view that a standard is not "clear and objective" any time that one of its terms, considered apart from its context, has more than one plausible meaning, and we agree with LUBA that the challenged terms of the oceanfront setback are clear and objective.

Local governments have long been required to "adopt and apply only clear and objective standards, conditions and procedures regulating the development" of "needed housing." ORS 197.307(4); *see Nieto v. City of Talent*, ___ Or LUBA ___, ___ (LUBA No 2020-100, Mar 10, 2021) (slip op at 8) (explaining that the needed-housing statutes were enacted in 1981). When clear and objective standards are required for needed housing, "the local government

_____

[2] We reject without discussion petitioners' other arguments raised in the first assignment of error.

imposing the provisions of the ordinance shall demonstrate that the approval standards, conditions and procedures are capable of being imposed only in a clear and objective manner." ORS 197.831.

In 2017, the legislature extended the "clear and objective" requirement to the development of all housing. *See* Or Laws 2017, ch 754, § 5; *see also Warren v. Washington County*, 296 Or App 595, 598, 439 P3d 581, *rev den*, 365 Or 502 (2019) (after the 2017 amendments, ORS 197.307(4) "provides that local government can regulate the development of housing only through clear and objective standards, conditions, and procedures").[3] The legislature accomplished that change by simply amending the provision that formerly addressed only needed housing to apply to "housing, including needed housing." Or Laws 2017, ch 745, § 5 ("[A] local government may adopt and apply only clear and objective standards, conditions and procedures regulating the development of **housing, including** needed housing ***." (Boldface added.)). In our view, that change was meant to expand application of the existing "clear and objective" standard to all housing; it did not demonstrate any intention to change or reformulate the existing "clear and objective" standard.

LUBA, and, to a lesser extent, this court, have articulated and refined the "clear and objective" standard under ORS 197.307 over many years. We agree with petitioners that, fundamentally, the standard has two parts: First, a standard, condition, or procedure must be objective. As LUBA has explained, "objective" means "existing independent of mind." *Nieto*, ___ Or LUBA ___, ___ (slip op at 9 n 6). Standards are not objective "if they impose 'subjective, value-laden analyses that are designed to balance or mitigate impacts of the development on (1) the property to be developed or (2) the adjoining properties or community.'"

---

[3] The legislature has also provided that discretionary permit approvals must apply clear and objective standards. ORS 227.173(2). In this case, there has been some debate about whether this is a discretionary approval. As LUBA did, we observe that our resolution of petitioners' arguments applies with equal force under both ORS 197.307(4) and ORS 227.173(2). *Ruddell v. City of Bandon*, 249 Or App 309, 320, 275 P3d 1010 (2012) ("[W]e conclude that our resolution of petitioners' arguments related to ORS 197.307(6) (2009) apply with equal force to their claims under ORS 227.173.").

*Legacy Dev. Grp., Inc. v. City of The Dalles*, \_\_\_ Or LUBA \_\_\_, \_\_\_ (LUBA No 2020-099, Feb. 24, 2020) (slip op at 7) (quoting *Rogue Valley Assoc. of Realtors v. City of Ashland*, 35 Or LUBA 139, 158 (1998), *aff'd*, 158 Or App 1, 970 P2d 685, *rev den*, 328 Or 594 (1999)); *id.* at \_\_\_ (slip op at 14) ("Terms such as 'necessary' and 'consistent' are designed to balance or mitigate impacts from development and, therefore, are not objective." (Some internal quotation marks and brackets omitted.)); *see also Ruddell v. City of Bandon*, 249 Or App 309, 319, 275 P3d 1010 (2012) (quoting and applying the same standard from LUBA's opinion in *Rogue Valley Assoc. of Realtors*).

Second, as LUBA observed in this case, standards must also be clear. "[T]he term 'clear' means 'easily understood' and 'without obscurity or ambiguity.'" *Roberts*, \_\_\_ Or LUBA at \_\_\_ (slip op at 19) (quoting *Nieto*, \_\_\_ Or LUBA \_\_\_, \_\_\_ (slip op at 9 n 6)). This second prong of the analysis is better developed in LUBA's case law than in our own. *See, e.g.*, *Group B, LLC v. City of Corvallis*, \_\_\_ Or LUBA \_\_\_, \_\_\_ (LUBA No 2015-019, Aug 25, 2015) (slip op at 13-14), *aff'd*, 275 Or App 557, 364 P3d 355 (2015), *rev den*, 359 Or 667 (2016) (a condition that could be construed "to support either of two diametrically opposed conclusions" "is not a 'clear and objective' standard or condition within the meaning of ORS 197.307(4)"). Ultimately, in the context of ORS 197.307(4), the degree of clarity required for standards, conditions, and procedures for housing development represents a balance between the need of applicants for an understandable route to approval of the applied-for development and the need of local governments for code-drafting requirements that are realistically achievable. *See, e.g.*, Video Recording, House Committee on Human Services and Housing, HB 2007, Apr 13, 2017, at 29:55 (statement of Rep. Tina Kotek), *available at* https://olis.oregonlegislature.gov (accessed Dec 7, 2021) (indicating that it would be achievable for cities to apply only clear and objective standards to all housing).

Here, however, we need not delve into the details of the required degree of clarity, because, as explained below, we disagree with the basic premise of petitioners' argument. As we understand their view, a standard cannot be clear and objective if any of its terms, considered apart from their

context, are capable of a meaning different from the one advanced by the local government. In support of that view, they rely on *Tirumali v. City of Portland*, 169 Or App 241, 7 P3d 761 (2000), *rev den*, 331 Or 674 (2001).

As explained below, we disagree with petitioners' characterization of our holding in *Tirumali*. At the outset, we observe that, in that case, we were construing ORS 197.015(10)(b)(B), which addresses LUBA's subject-matter jurisdiction. Although the statute at issue here, ORS 197.307(4), also refers to "clear and objective standards," we note that the two statutory contexts are, in some ways, different. *See generally Garcia-Solis v. Farmers' Ins. Co.*, 365 Or 26, 35, 441 P3d 573 (2019) ("[T]he assumption of consistency is only an assumption. The text and context of a statute can refute that assumption.").

However, granting that our holding in *Tirumali* is at least relevant in this context, our reasoning in that case does not support petitioners' argument in this case. In *Tirumali*, the parties disputed whether, under the Portland City Code, the height of a building built on a steep lot should be measured from the lowest original grade on the property, or whether it should be measured from the top of any fill that was added during construction. 169 Or App at 245-46. LUBA noted that the code's definition of "grade" referred to a "finished surface" and concluded that that reference demonstrated that the building should be measured from the "finished" grade, that is, the top of any fill that was added during construction. *Id.*

We explained that, in that context,

"our inquiry *** is not to determine what the relevant terms in fact mean but only to determine whether they can plausibly be interpreted in more than one way. If so, they are ambiguous, and it would follow that the relevant city provisions are not 'clear and objective,' ORS 197.015(10)(b)(B)[.]"

*Id.* at 246. For purposes of that analysis, we noted that, although the term "finished surface" in the definition of "grade" was appropriate context to consider in resolving the ambiguity in the text of the provision itself, that term was also ambiguous. *Id.* One potential meaning of "finished" undercut the view that "finished surface" referred to the

final grade, and the other supported it. *Id.* We particularly noted that "[n]o context of which we are aware resolves the ambiguity," nor had the parties provided persuasive legislative history. *Id.* Finally, canons of construction also led in conflicting directions. *Id.* at 246-47. Based on our conclusion that the city's standard was ambiguous, we held that it was not clear and objective for purposes of ORS 197.015(10)(b)(B), and, consequently, that LUBA had jurisdiction.

Here, petitioners rely on *Tirumali* as support for their view that, to meet the statutory requirement of a clear and objective standard, the city must show that none of the terms of the oceanfront setback provision are ambiguous, even when they are considered apart from their context and the purpose of the ordinance. But *Tirumali* does not stand for that proposition. Rather, in *Tirumali*, we considered the text of the ordinance, in the context of relevant definitions and all other relevant context (of which there was none); then we considered legislative history (of which there was also none); then we considered canons of construction. None of those steps yielded an answer. In short, we conducted a full construction of the ordinance and concluded that, even after that exercise, it remained ambiguous. *Tirumali*, 169 Or App at 246-47. For *that* reason, we concluded that the ordinance was not "clear and objective" for purposes of ORS 197.015(10)(b)(B). Our analysis in *Tirumali* does not support petitioners' view that we must consider only the individual terms of the ordinance and that it is immaterial whether reference to their context or the purpose of the ordinance resolves any ambiguity.

Nearly 20 years ago, LUBA rejected the view that petitioners assert:

"In *Home Builders Assoc. v. City of Eugene*, [41 Or LUBA 370, 393 n 20 (2002),] we explained that 'the ultimate question under ORS 197.307[(4)] is whether the *standard* is clear and objective, viewed in context. That the standard may contain imprecise or ambiguous terms is a relevant and, depending on the terms and their function in the standard, perhaps sufficient, consideration in answering that ultimate question. However, the existence of imprecise or ambiguous terms in a standard does not *necessarily* resolve whether that standard violates ORS 197.307[(4)].'"

*Knoell v. City of Bend*, ___ Or LUBA ___, ___ (LUBA No 2020-037, Aug 20, 2021) (slip op at 4) (emphases in *Home Builders Assoc.*; second and third brackets in *Knoell*); *see also Ruddell*, 249 Or App at 320 (relying on LUBA's construction of "clear and objective standards" in *Home Builders Assoc.*). That reasoning by LUBA is consistent with the statutory text, which provides that "a local government may adopt and apply only *clear and objective standards, conditions and procedures* regulating the development of housing," ORS 197.307(4) (emphasis added), and with our case law. We adopt that reasoning and, consequently, reject petitioners' proposed analysis for whether an approval standard is adequately clear.

Having done that, we agree with LUBA that each of petitioners' text-specific arguments fails. Petitioners argue that the term "average," which the oceanfront setback applies, in some circumstances, to a single number; the undefined term "Oregon Coordinate Line"; and the term "lot" are ambiguous. In light of our rejection of petitioners' argument that any ambiguous term, standing alone, prevents a standard from being clear and objective, the question is whether any ambiguity in those terms makes the oceanfront setback standard itself ambiguous in a way that cannot be resolved by reference to its context, its purpose, or some other appropriate consideration.

As we will briefly explain, we conclude that it does not. First, although petitioners are correct that an average is usually calculated based on a set containing more than one value, in context, it is clear that CBMC 17.42.050(A)(6)(c) contemplates that, in some cases—cases exactly like this one, where there is a single building within 100 feet of the side lot lines of the affected property—the average will be calculated from a set containing one number.[4]

---

[4] As set out above, the relevant text of CBMC 17.42.050(A)(6) provides, as follows:

"c. The oceanfront setback line for a parcel is determined as follows:

"i. Determine the affected buildings; the affected buildings are those located one hundred feet north and one hundred feet south of the parcel's side lot lines.

"ii. Determine the setback from the Oregon Coordinate Line for each building identified in subsection (A)(6)(c)(i) of this section.

Second, regarding the Oregon Coordinate Line, LUBA explained that "a reasonable person reading CBMC 17.42.050, which is in the CBMC chapter governing the OM overlay zone, would understand that 'Oregon Coordinate Line' is the only statewide surveyed line that crosses the state of Oregon from north to south along the state's ocean-front." That line is the one identified in ORS 390.770 by reference to surveyed points. We agree with LUBA that, in the context of the oceanfront setback, the term "Oregon Coordinate Line" in CBMC 17.42.050(A)(6)(c) is neither ambiguous—because there is only one line to which it could reasonably refer—nor obscure.[5]

Finally, we consider the various arguments that petitioners advance about the term "lot" in CBMC 17.04.320, the provision that defines the group of lots—"lots abutting the oceanshore"—to which the oceanfront setback applies. As set out above, a "lot abutting the oceanshore" includes "a lot where there is no buildable lot between it and the Oregon Coordinate Line." CBMC 17.04.320. Petitioners argue that the term "lot" in "buildable lot" is ambiguous because the definition of "lot" includes the term "plot," and a plot, according to a dictionary definition, is a mea-sured piece of land. They point out that the neighboring property on which the city relied in calculating the ocean-front setback includes enough property to allow another house to be built on it sometime in the future. Thus, they

---

"iii. Calculate the average of the setbacks of each of the buildings identi-fied in subsection (A)(6)(c)(ii) of this section.

"d. If there are no buildings identified by subsection (A)(6)(c)(i) of this section, then the oceanfront setback line shall be determined by buildings that are located two hundred feet north and two hundred feet south of the parcel's side lot lines."

CBMC 1.04.040 provides, in turn, that, unless it is apparent from the context that a different construction is intended, "[t]he singular number includes the plural and the plural includes the singular."

[5] We also reject petitioners' suggestion that even a clear reference to the statutorily established line in ORS 390.770 violates the requirement that the standard be clear and objective because the statutory line—established by a list of surveyed points along the ocean shore—is too difficult for an applicant to under-stand. The standard is required to be "clear and objective," ORS 197.307(4), not simplistic. For the same reason, we reject the arguments of *amicus* Homebuilders Association of Metropolitan Portland that the oceanfront setback standard is not clear and objective because it contains too many words in general and too many conjunctions in particular.

argue, there is a buildable "plot" on the neighboring property, and, as a consequence, the oceanfront setback does not apply to the house that is currently on the neighboring property.

Petitioners' efforts to create ambiguity in the ordinance fail once again here. Accepting, for the sake of argument, petitioners' premise that a plot is a measured piece of land, their argument fails to account for the fact that the measured area must be a *piece* of land. Here, as LUBA observed, it is possible that, at some time in the future, the neighboring property could be divided so as to create a buildable piece of land between the neighboring house and the ocean. However, presently, there is no buildable plot between the neighboring house and the ocean.

Petitioners also contend that, for a variety of reasons, a platted right-of-way that runs between their property and the ocean is a "lot," and that that demonstrates ambiguity in the term "lot." However, in those arguments, petitioners have not addressed LUBA's conclusion that, regardless of the possible breadth of meanings of the term "lot," the right-of-way is not a "buildable lot" under the terms of the ordinance. That the term "lot," considered apart from its context, may be ambiguous is immaterial because, based on a part of LUBA's reasoning that petitioners do not dispute, the term "buildable lot," as used in CBMC 17.04.320, is clear and objective.

In short, petitioners' arguments rely on potential ambiguity in various terms when they are considered without reference to their context and the purpose of the ordinance. As explained above, that is not what the "clear and objective" standard requires. We reject petitioners' first assignment of error.

In petitioners' second assignment of error, they contend that ORS 227.175(4)(c) and (e) prohibit application of the oceanfront setback to their application because that statute prohibits cities from applying any setback or other clear and objective standard of any kind that has the effect of reducing the maximum density of development that is otherwise

allowed by code.[6] We agree with LUBA that ORS 227.175(4)(c) and (e) do not prohibit denial of an application based on non-compliance with a clear and objective standard that has the incidental effect of reducing the density of the development below the maximum density otherwise allowed in the zone.

We take the additional facts relevant to this assignment of error from LUBA's opinion. As explained above, petitioners applied for a development permit to build a 2,712-square-foot house on their lot. The proposed house had less than the maximum floor area allowed for the lot under the relevant code section. CBMC 17.10.040(D) ("The maximum gross floor area for a permitted or conditional use on a lot of more than five thousand square feet, but less than six thousand square feet, shall not exceed three thousand square feet.").

City planning staff approved the application, subject to the condition that the residence comply with the oceanfront setback. To comply with the oceanfront setback, the floor area of the residence would have had to be substantially less than 2,712 square feet. Petitioners appealed to the planning commission, arguing, among other things, that the oceanfront setback did not apply to their application in light of ORS 197.175(4)(c) and (e). The planning commission

---

[6] As discussed further below, ORS 227.175(4)(c) provides, as follows:

"A city may not condition an application for a housing development on a reduction in density if:

"(A) The density applied for is at or below the authorized density level under the local land use regulations; and

"(B) At least 75 percent of the floor area applied for is reserved for housing."

ORS 227.175(4)(e) provides, as follows:

"Notwithstanding paragraphs (c) and (d) of this subsection, a city may condition an application for a housing development on a reduction in density or height only if the reduction is necessary to resolve a health, safety or habitability issue or to comply with a protective measure adopted pursuant to a statewide land use planning goal. Notwithstanding ORS 197.350, the city must adopt findings supported by substantial evidence demonstrating the necessity of the reduction."

"Authorized density level" means "the maximum number of lots or dwelling units or the maximum floor area ratio that is permitted under local land use regulations." ORS 227.175(4)(f)(A).

denied the application, reasoning that the oceanfront setback applied and that petitioners' proposed dwelling could not comply with it. Petitioners appealed the planning commission decision to the city council, which affirmed the planning commission denial.[7]

Petitioners appealed to LUBA, again contending that the oceanfront setback did not apply to their application. As relevant here, petitioners argued that ORS 227.175(4)(c) and (e) prohibited the city from applying the oceanfront setback because the oceanfront setback had the effect of reducing the density of petitioners' proposed residence by reducing its floor area. LUBA rejected that argument, reasoning that ORS 227.175(4)(c) and (e) did not prohibit the city from denying petitioners' application for failure to comply with the oceanfront setback because the setback is a clear and objective standard that only incidentally affected the allowed floor area, and, thus, the density, of petitioners' dwelling.

On judicial review, petitioners again contend that, in light of ORS 227.175(4)(c), the city was not permitted to apply the oceanfront setback to their application. For their part, respondents contend that those statutory provisions do not preempt cities' setback provisions or other clear and objective standards—for example, clear and objective standards requiring sidewalks or parking—that have the incidental effect of reducing the density of development below the maximum otherwise allowed by code.

The parties' arguments raise a question of statutory construction, which we resolve through the familiar method articulated by the Supreme Court in *State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009). With the aim of discerning the legislature's intentions, we begin by considering the text of the statute in context. To the extent that it is helpful to our analysis, we consider the legislative history of the statute. Finally, if any ambiguity remains after we consider the text, context, and legislative history, we apply maxims of statutory construction. *Id.*

---

[7] Both the planning commission and the city council noted that petitioners could apply for a setback reduction from the planning commission pursuant to CBMC 17.64, but that they had not done that.

ORS 227.175 sets out procedural and substantive requirements for a city's consideration of applications for "a permit or zone change." ORS 227.175(1); *see also* ORS 227.175(2) ("The governing body of the city shall establish a consolidated process by which an applicant may apply at one time for all permits or zone changes needed for a development project."). Subsection four of the statute provides standards for approval, imposition of conditions, and denial of applications. It provides, as follows:

"(a)   A city may not approve an application unless the proposed development of land would be in compliance with the comprehensive plan for the city and other applicable land use regulation or ordinance provisions. The approval may include such conditions as are authorized by ORS 227.215 or any city legislation.

"(b)(A)   A city may not deny an application for a housing development located within the urban growth boundary if the development complies with clear and objective standards, including clear and objective design standards contained in the city comprehensive plan or land use regulations.

"(B)   This paragraph does not apply to [two situations that are not at issue here, namely, city or regional centers and optional alternative approval processes.]

"(c)   A city may not condition an application for a housing development on a reduction in density if:

"(A)   The density applied for is at or below the authorized density level under the local land use regulations; and

"(B)   At least 75 percent of the floor area applied for is reserved for housing.

"(d)   A city may not condition an application for a housing development on a reduction in height if:

"(A)   The height applied for is at or below the authorized height level under the local land use regulations;

"(B)   At least 75 percent of the floor area applied for is reserved for housing; and

"(C)   Reducing the height has the effect of reducing the authorized density level under local land use regulations.

"(e)   Notwithstanding paragraphs (c) and (d) of this subsection, a city may condition an application for a housing development on a reduction in density or height only if the reduction is necessary to resolve a health, safety or habitability issue or to comply with a protective measure adopted pursuant to a statewide land use planning goal. Notwithstanding ORS 197.350, the city must adopt findings supported by substantial evidence demonstrating the necessity of the reduction.

"(f)   As used in this subsection:

"(A)   'Authorized density level' means the maximum number of lots or dwelling units or the maximum floor area ratio that is permitted under local land use regulations.

"(B)   'Authorized height level' means the maximum height of a structure that is permitted under local land use regulations.

"(C)   'Habitability' means being in compliance with the applicable provisions of the state building code under ORS chapter 455 and the rules adopted thereunder."

Before LUBA, the parties disagreed about the meaning of paragraphs (4)(c) and (e) in several ways. They disputed whether those paragraphs apply to applications for permits that the city approves as a matter of right, or only to applications for permits that the city approves as a matter of discretion, and, if the latter, whether this application qualifies. They disputed whether those paragraphs have any effect when a city denies an application, rather than approving the application subject to conditions. They disputed whether the paragraphs prohibit a city from applying clear and objective standards that do not expressly, but rather only incidentally, require a reduction in density. And they disputed whether, in this case, application of the oceanfront setback was "necessary to resolve a health, safety or habitability issue or to comply with a protective measure adopted pursuant to a statewide land use planning goal." ORS 227.175(4)(e). The parties renew many of those arguments on appeal.

We resolve only one of those questions.[8] As explained below, we conclude that ORS 227.175(4)(c) and (e) do not prohibit a city from applying clear and objective standards that incidentally require a reduction in density. In other words, we agree with respondents that, in enacting ORS 227.175(4)(c) and (e), the legislature did not intend to preempt the ability of local governments to apply clear and objective standards, like setbacks, that have a purpose other than reducing density but nevertheless have the effect of reducing the floor area or number of lots or dwelling units below the maximum otherwise allowed for the zone. Accordingly, we need not, and do not, consider any of the other issues raised by the parties. We affirm LUBA's decision.

The two paragraphs of the statute that are at issue—ORS 227.175(4)(c) and (e)—phrase the prohibited action in essentially the same way: "A city may not condition an application for a housing development on a reduction in density ***." ORS 227.175(4)(c); *see also* ORS 227.175(4)(e) ("[A] *city may condition an application for a housing development on a reduction in density or height* only if the reduction is necessary to resolve a health, safety or habitability issue or to comply with a protective measure adopted pursuant to a statewide land use planning goal." (Emphasis added.)). Petitioners contend that that text forbids application of any standard (other than one that "is necessary to resolve a health, safety or habitability issue or to comply with a protective measure adopted pursuant to a statewide land use planning goal," ORS 227.175(4)(e)) that has the effect of reducing the allowed density of the development, whether it does so directly or only incidentally. To illustrate, in petitioners' view, ORS 227.175(4)(c) prohibits a city from approving an application subject to a condition stating, "the floor area will be reduced to half of the floor area allowed under the maximum floor area ratio for the zone," and equally prohibits a city from approving an application subject to a condition stating that a building must comply with a clear and objective side setback requirement, if the result of applying the setback requirement to the lot at issue is that

---

[8]  Moreover, we express no opinion on whether petitioners' proposed dwelling is a "housing development" within the meaning of ORS 227.175(4)(c).

the building cannot achieve the maximum floor area ratio allowed for the zone.[9]

For their part, respondents posit that the legislature did not intend to prohibit application of clear and objective standards that, though they are aimed at achieving other goals, have the incidental effect of reducing density below the maximum allowed. Respondents contend that that understanding of the statute is supported by its text, context, and legislative history, as well as the principle that a legislative intention to preempt local law—in this case, a purported legislative intention to preempt a variety of clear and objective local standards, including setbacks—must be stated unambiguously.

Given the plain meaning of the text—in particular, the lack of specificity of the text, "condition an application ∗∗∗ on a reduction in density"—either construction of the statute is plausible. An application could be "condition[ed] on ∗∗∗ a reduction in density" whenever the effect of the city's application of any standard is to reduce density—as petitioners contend—or only when the decision expressly requires a reduction in density, as respondents contend. *See Webster's Third New Int'l Dictionary* 473 (2002 ed unabridged) ("condition," as a transitive verb, means "to invest with, limit by, or subject to conditions : burden with a condition : make conditional ∗∗∗ : restrict or determine as a condition"). The text provides no clues as to the legislature's intention on that issue.

With that in mind, we turn to context. ORS 227.175(4)(d), which immediately follows ORS 227.175(4)(c), was enacted as part of the same bill as ORS 227.175(4)(c). *See* Or Laws 2017, ch 745, § 3. It provides, as follows:

"A city may not condition an application for a housing development on a reduction in height if:

"(A)  The height applied for is at or below the authorized height level under the local land use regulations;

---

[9] As noted above, we need not, and do not, consider whether the text of ORS 227.175(4)(c) applies only when a city approves an application but imposes conditions, or whether it also applies when a city denies an application. For simplicity, we use approval with conditions in our examples.

"(B)   At least 75 percent of the floor area applied for is reserved for housing; and

"(C)   Reducing the height has the effect of reducing the authorized density level under local land use regulations."

For purposes of both ORS 227.175(4)(c) and (d), "authorized density level" means "the maximum number of lots or dwelling units or the maximum floor area ratio that is permitted under local land use regulations." ORS 227.175(4)(f)(A).

We agree with respondents that paragraph (4)(d) strongly suggests that the legislature did not intend paragraph (4)(c) to prohibit application of clear and objective standards that incidentally, rather than expressly, reduce density below the maximum allowed for the zone. If petitioners' understanding of paragraph (4)(c) were correct—if that paragraph prohibited application of any standard that even incidentally reduces density below the maximum allowed—there would be no need for the legislature to prohibit cities from conditioning applications on reductions in height that have "the effect of reducing the authorized density level under local land use regulations." All height restrictions that have the effect of reducing the authorized density level below the maximum density allowed under local land use regulations would already be prohibited by paragraph (4)(c). Petitioners' understanding of paragraph (4)(c) renders paragraph (4)(d) surplusage. Accordingly, in our view, the paragraph's context strongly suggests that respondents' proffered construction is correct.

We do not find the legislative history of ORS 227.175(4) to be particularly helpful on this question. On one hand, one of the purposes of the bill in which ORS 227.175(4)(c) and (e) were enacted was, as petitioners summarize it, to "remove local governments' opportunity to reduce density at the maximum floor area ratio that the zone allowed." On the other hand, the legislative history makes clear that the legislature did not intend to strip local governments of their authority to regulate housing through application of clear and objective standards like setbacks, which is the situation that would exist if petitioners' understanding of ORS 227.175(4)(c) were correct. *See, e.g.*, Staff Measure Summary, House Committee on Rules, SB 1051 A, July 3,

2017 (explaining that the bill would require local jurisdictions to allow "at least one accessory dwelling unit (ADU) for each single-family home in areas zoned for single-family dwellings" and noting that "[l]ocal jurisdictions may impose reasonable regulations related to approval of ADUs including, but not limited to, design and site-specific consideration like infrastructure"); Testimony, House Committee on Human Services and Housing, HB 2007, Apr 13, 2017, Ex A (Testimony of Rep. Tina Kotek) ("It is possible to have a permitting process that allows for local control regarding design <u>and</u> clear and objective standards related to those design preferences." (Underscoring in original.)).[10]

Finally, we agree with respondents and *amicus curiae* League of Oregon Cities that, under the circumstances presented here—where the legislature has enacted an ambiguous provision that, under one construction, would have the effect of divesting local governments of their ability to regulate in an area that has long been within local control—home-rule principles undercut the argument that the legislature intended the statutory text to have broad meaning. *See Owen v. City of Portland*, 368 Or 661, 674, 497 P3d 1216 (2021) (plaintiffs' argument that a statute prohibiting "enact[ment of] any ordinance or resolution which controls the rent that may be charged for the rental of any dwelling unit" should be construed to prohibit an ordinance that influenced, but did not expressly restrain or direct, the amount of rents was "unavailing," "[p]articularly when considered in light of our cases holding that state law can preempt home-rule authority only when, and to the extent that, the party urging preemption can demonstrate that the legislature unambiguously expressed its intent—a high bar to overcome" (internal quotation marks omitted)); *LaGrande/Astoria v. PERB*, 281 Or 137, 148-49, 576 P2d 1204, *adh'd to on reh'g*, 284 Or 173, 586 P2d 765 (1978) ("It is * * * reasonable to assume that the legislature does not mean to displace local civil or administrative regulation of local conditions by a statewide law unless that intention is apparent." (Internal footnote omitted.)).

---

[10] The relevant bill was introduced as HB 2007 (2017), but it was enacted as SB 1051 (2017). *Compare* HB 2007 (2017), *with* SB 1051 A (2017).

Accordingly, we reject petitioners' argument that ORS 227.175(4)(c) and (e) prohibit application of all standards that have the effect of reducing density below the maximum density allowed for the zone. Here, the city denied petitioners' application on the ground that the proposed dwelling failed to comply with the oceanfront setback, a clear and objective standard that only incidentally affected the allowed density of petitioners' proposed dwelling. That denial did not violate ORS 227.175(4)(c) or (e).

Affirmed.