762                September 5, 2024                No. 635

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

Stanley ROBERTS
and Rebecca Roberts,
*Respondents,*

*v.*

CITY OF CANNON BEACH,
*Respondent Below,*
*and*

HAYSTACK ROCK, LLC,
*Petitioner.*

Land Use Board of Appeals
2023066; A184314

Argued and submitted July 3, 2024.

William L. Rasmussen argued the cause for petitioner. Also on the brief were Steven G. Liday, Iván Resendiz Gutierrez, and Miller Nash, LLP.

Wendie Kellington argued the cause for respondents. Also on the brief were Kelly Huedepohl and Kellington Law Group, P.C.; and Sara Kobak and Schwabe, Williamson & Wyatt, P.C.

Before Egan, Presiding Judge, Kamins, Judge, and Walters, Senior Judge.

KAMINS, J.

Reversed in part and remanded.

**KAMINS, J.**

Petitioner Haystack Rock, LLC (Haystack) seeks judicial review of a final order by the Land Use Board of Appeals (LUBA) remanding the City of Cannon Beach's decision denying an application by respondents Stanley Roberts and Rebecca Roberts (applicants) for a development permit to construct a residence on their inaccessible oceanfront lot located on the face of an active landslide. Haystack raises four assignments of error, asserting that LUBA erred by: (1) affirming the city's determination that the application complied with tree-protection code provisions; (2) reversing the city's determination that the application did not satisfy the clear-vision criterion; (3) reversing the city's determination that the application does not comply with the oceanfront setback standard; and (4) affirming the city's conclusion that the statute requiring that "housing development" be subject to "clear and objective standards," ORS 197.307(4) (2017),[1] applies to the development of a public right-of-way. For the reasons stated below, we affirm LUBA's decision in all aspects but one; we agree with Haystack that LUBA erred in affirming the city's determination that public right-of-way development regulations must be "clear and objective." Therefore, we reverse LUBA's order in part and remand for further proceedings.

Applicants' property is located on a steep, vegetated oceanfront slope overlooking Haystack Rock. The property is bordered to the north and east by Haystack's property, and to the south by the undeveloped Nenana Avenue right-of-way (Nenana ROW). The property does not have improved vehicular access.

Applicants have submitted several applications to develop the property, producing a somewhat complex procedural backdrop. In 2020, applicants applied to construct a new residence on the property as well as a "public" road over Nenana ROW that would provide dedicated access to the residence. The city denied the development permit for the proposed residence because the proposal did not comply with the oceanfront setback standard, and LUBA affirmed.

---

[1] *Former* ORS 197.307(4) (2017) was amended and renumbered as ORS 197A.400(1) in 2023. Or Laws 2023, ch 533, §§ 1, 2. In this opinion, all references are to the version enacted in 2017.

On judicial review, we affirmed and upheld the oceanfront setback standard as clear and objective. *Roberts v. City of Cannon Beach*, 316 Or App 305, 307, 504 P3d 1249 (2021), *rev den*, 370 Or 56 (2022).

In 2021, applicants submitted the application at issue, proposing a redesigned development of the property. The application was submitted alongside an application for a right-of-way permit for development of a raised "private driveway" built on Nenana ROW, which the city shelved upon Haystack's request that the city refrain from making a decision regarding the proposed easement until after the legal questions at issue in this case are resolved.[2] Despite the lack of vehicular access, the city's former community director conditionally approved the application.

That decision was remanded by LUBA, because the city had not provided Haystack or the public with notice of the decision and an opportunity to appeal. On remand, the city reversed course and denied the application for two reasons: (1) it did not comply with the oceanfront setback standard, and (2) it failed to demonstrate compliance with the clear-vision standard. Applicants appealed to LUBA.

LUBA reversed the city's two grounds for denying the application but sustained Haystack's cross-assignment of error challenging the city's failure to address the city standard prohibiting removal of stabilizing vegetation within the oceanfront management overlay zone. LUBA remanded the decision to the city for evaluation of that standard. Both parties seek judicial review.[3]

We review LUBA's order to determine whether it is "unlawful in substance or procedure," ORS 197.850(9)(a), and for "whether LUBA correctly applied the substantial evidence standard." *Tylka v. Clackamas County*, 330 Or App 247, 248, 543 P3d 743 (2024). "A LUBA order is unlawful in substance if it represents a mistaken interpretation of the applicable law." *Id*.

_____

[2] Whether the city may grant such an easement is the subject of a separate appeal in Case No. A182356.

[3] Haystack initiated the present petition, and applicants filed a petition in *Roberts v. City of Cannon Beach (A184314)*, 334 Or App 762, ___ P3d ___ (2024) (affirming LUBA's decision).

In its first assignment of error, Haystack contends that the application did not comply with the tree-removal standards contained in the Cannon Beach Municipal Code (CBMC) and that LUBA erred in failing to reverse on that basis.

The CBMC allows for the removal of trees when constructing an approved structure or development, so long as certain criteria are met. CBMC 17.70.020. The developer must obtain a tree-removal permit, submitted under the direction of a certified arborist, that includes a site plan showing the location of the development and the location of the trees on the subject property. CBMC 17.70.030(Q)(1). The site plan must also include measures to avoid damaging trees not approved for removal. CBMC 17.70.030(Q)(2). Trees not approved for removal must be protected during construction by a tree-protection zone, such as a fenced-off buffer around the tree, where excavation, vehicular traffic, and storage of materials are prohibited. CBMC 17.70.030(Q)(4). Under CBMC 17.04.557—a provision contained in the section of the code entitled "Definitions," rather than the section entitled "Tree Removal and Protection"—the radius of a tree-protection zone must be at least two feet for every inch of the diameter of the tree's trunk at four and one-half feet above grade.

Haystack argues that the tree-protection zones contained in applicants' tree-removal plan failed to meet the requirements of CBMC 17.04.557. Applicants respond that LUBA was correct to affirm the city's approval of the application—including the tree-removal plan—because that approval was conditioned on ongoing compliance with the city's tree-removal standards.

We agree with applicants. They agreed to ongoing compliance with all applicable tree-protection and removal standards and have not removed any trees in violation of the city standards. The city approved the application subject to that ongoing compliance: "To the extent the City approves the application for development, it would have been subject to conditions to ensure the other provisions of this chapter are met." That approval does not necessarily indicate that applicants are entitled to implement the site plan as it is currently

depicted in the application; instead, as we understand it, it means that the application must proceed for later (and ongoing) determination of compliance with city standards, *before* any tree removal occurs. And applicants' consulting arborist explained the steps that will be taken to ensure ongoing compliance with the applicable tree-protection and removal requirements contained in the CBMC. Specifically, the arborist explained that a site plan will be submitted to implement mitigation measures and strategies to avoid damaging trees not proposed for removal, to limit the potential impact of excavation, soil compaction, and storage of materials.

Haystack argues that the radii of the tree-protection zones in the application's current site plan are insufficient. *See* CBMC 17.04.557 (describing the mandatory dimensions for tree-protection zones). But the city's approval of the application made clear that applicants are required to comply with city tree removal and protection standards, and Haystack does not identify any error in LUBA's finding that there has been no tree-removal or tree-protection violation.

In its second assignment of error, Haystack challenges LUBA's determination that the application satisfied the clear-vision criterion as a matter of law. Under the CBMC, a "clear-vision area shall be maintained on the corners of all property adjacent to the intersection of two streets." CBMC 17.90.040(A). The CBMC provides additional detail on how to determine compliance. CBMC 17.90.040(B).

In assessing whether applicants satisfied the clear-vision criterion for the proposed intersection of the Nenana ROW and South Hemlock Street, the city found that applicants had not provided sufficient information to make that determination. Specifically, the city noted that applicants failed to provide civil engineering plans sufficient for the city's engineers to assess whether the proposed intersection complied with the clear-vision requirement. LUBA disagreed. Rather than finding that the city's conclusion was not supported by substantial evidence, LUBA found that the clear-vision criterion was satisfied as a matter of law because the only evidence in the record with respect to sight lines is applicants' expert testimony and reports showing compliance.

Haystack first contends that LUBA applied the incorrect standard of review. Haystack is correct that, in reviewing LUBA's consideration of a local government's factual findings, we ordinarily "examine whether LUBA has applied the proper substantial-evidence standard of review." *S. St. Helens, LLC v. City of St. Helens*, 271 Or App 680, 682, 352 P3d 746 (2015) (quoting *Stevens v. City of Island City*, 260 Or App 768, 772, 324 P3d 477 (2014)). "[W]here LUBA has properly understood and applied the 'substantial evidence' test ***, a reviewing court should affirm its order, notwithstanding the reviewing court's disagreement with LUBA as to whether the evidence is 'substantial.'" *Younger v. City of Portland*, 305 Or 346, 358-59, 752 P2d 262 (1988). "Thus, where LUBA properly articulates its substantial-evidence standard of review under ORS 197.835(9)(a)(C), we will not reverse its determination unless there is no evidence to support the finding or if the evidence in the case is 'so at odds with LUBA's evaluation that a reviewing court could infer that LUBA had misunderstood or misapplied its scope of review.'" *Stevens*, 260 Or App at 772 (quoting *Younger*, 305 Or at 359).

In this case, however, LUBA went further than deciding that the city's determination was not supported by substantial evidence and remanding to permit reconsideration. LUBA determined that the only decision that the city could reach was that the applicant had satisfied the clear-vision criterion as a matter of law. LUBA apparently applied the principle (a principle with which Haystack does not quarrel) that it is permitted to reverse a city's denial of an application for failure to meet an approval criterion rather than remanding for further consideration, when the record demonstrates that the criterion was satisfied as a matter of law.[4] *Jurgenson v. Union County Court*, 42 Or App 505, 510, 600, 15 P2d 1241 (1979). In such a situation, LUBA takes up a question of law, and, consequently, in the course

---

[4] *Jurgenson*, which was a writ-of-review proceeding, was decided before LUBA's scope of review was established with the passage of ORS 197.835. Rather than ground its analysis in statute, the *Jurgenson* court analogized the denial of a land use application to a negligence case where a defendant who did not have the burden of proof presented no evidence but still prevailed. 42 Or App at 510. Neither party raises the issue or asks us to consider whether *Jurgenson* remains good law in light of the statutory changes.

of considering whether LUBA's order is "unlawful in substance," ORS 197.850(9)(a), we consider whether it "represents a mistaken application of the applicable law." *Tylka*, 330 Or App at 248.

On that question, Haystack argues that LUBA was legally incorrect—that, as a matter of law, applicants did not submit information necessary to demonstrate compliance.

We disagree. Haystack does not identify what additional information is necessary to assess clear-vision compliance. At oral argument, Haystack suggested that the proposal is missing a stop sign, and that a stop sign is necessary to measure sight-line distances. But that argument was not raised below or in the briefs. The need for a stop sign was not a stated basis for the city's decision, nor is a stop sign required by CBMC 17.90.040. *See* CBMC 17.90.040(c) (excluding "traffic control signs" from sight line measurement requirements).

We also disagree with Haystack's contention, if any, that there is more than one conclusion the city could have reached from the evidence presented. The evidence in the record, including reports and diagrams, requires a conclusion that vehicles exiting the property are not blocked by any obstacles within the required clear-vision area in the ways prohibited by CBMC 17.90.040. And applicants' engineer submitted a report stating that the clear-vision analysis for the current proposed driveway options remains materially unchanged from a 2020 roadway intersection proposal that was approved by the city's public works director as complying with the clear-vision requirement. The city's engineer generally described additional needed information to assess overall compliance in its latest report but did not indicate that that information was necessary to address CBMC 17.90.040's clear-vision requirement.[5] And, after the city's engineer produced the report requesting additional information, applicants' engineer provided the missing information that relates to the clear-vision requirement.

---

[5] Indeed, much of the report is unrelated to that requirement. Although the report mentioned "sight distance," that mention was in relation to applicants' failure to demonstrate compliance with CBMC 17.50.040—a provision relating to eliminating or minimizing geological hazards.

The conclusion that more evidence was necessary is inconsistent with the record and the criterion itself, and the record supports only a determination that applicants satisfied the clear-vision criterion. *Jurgenson*, 42 Or App at 510.

In its third assignment of error, Haystack challenges LUBA's reversal of the city's finding that the application did not comply with the CBMC's oceanfront setback standard. Rather than address whether the application complied with the standard, LUBA concluded that the standard could not be applied at all because it is not "clear and objective," as required by Oregon law. ORS 197.307(4).

We review LUBA's construction of a statute for legal error, *Central Oregon LandWatch v. Deschutes County*, 285 Or App 267, 276-77, 396 P3d 968 (2017), employing the methodology described in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), and *State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009). As explained below, we agree with LUBA that the definition of "structure" as used in the CBMC is not clear and objective.

Local governments may "adopt and apply only clear and objective standards, conditions and procedures regulating the development of housing[.]" ORS 197.307(4); *see also* ORS 197.831 (placing burden on local government to show clear and objective standards on appellate review). The "clear and objective" standard includes two fundamental parts: First, a standard must be objective. *Roberts*, 316 Or App at 311. "Objective" means "existing independent of mind." *Id*. (internal quotation marks omitted). Standards are not objective "if they impose subjective, value-laden analyses that are designed to balance or mitigate impacts of the development on (1) the property to be developed or (2) the adjoining properties or community." *Id*. (internal quotation marks omitted). Second, a standard must be clear. "[T]he term 'clear' means easily understood and without obscurity or ambiguity." *Id*. at 312 (internal quotation marks omitted).

The CBMC establishes setback requirements for development bordering the ocean, including the property at issue. Specifically, "all lots abutting the oceanshore" are

subject to an oceanfront setback standard[6] establishing the "ocean yard," in which most development is prohibited. CBMC 17.42.050(A)(6); CBMC 17.10.040(B)(6). That standard helps "ensure that development is consistent with the natural limitations of the oceanshore," to protect "identified recreational, aesthetic, wildlife habitat and other resources." CBMC 17.42.010.

As relevant here, and as the parties agree, "structures" are prohibited in the ocean yard. CBMC 17.04.570 (requiring that a yard be "an open space on a lot which is unobstructed from the ground upward except as otherwise provided"). CBMC 17.04.540 defines "structure" and sets out an illustrative list of exclusions to the term "structure":

> "'Structure' means any man-made assemblage of materials extending above the surface of the ground and permanently affixed or attached, or where not permanently affixed or attached to the ground not readily portable, but not including landscape improvements such as rock walls, retaining walls less than four feet in height, flag poles, and other minor incidental improvements similar to those described above."

Taken together, those ordinances explain that "structures" are generally prohibited in the ocean yard, with certain exceptions (fences, decks, and beach access stairs) as well as exclusions (including "landscape improvements such as *** retaining walls"). CBMC 17.04.540. We are now tasked with determining whether LUBA correctly concluded that the term "structure" as used in CBMC 17.04.540 and CBMC 17.42.050(A)(6)(b) is not "clear and objective" in violation of ORS 197.307(4).

We emphasize that our inquiry here is not to determine what the relevant terms mean in fact, but only to determine whether they could plausibly be interpreted in more than one way. If so, "they are ambiguous, and it would follow that the relevant city provisions are not 'clear and objective.'" *Tirumali v. City of Portland*, 169 Or App 241, 246, 7 P3d 761 (2000) (quoting ORS 197.015(10)(b)(B)).

---

[6] We upheld the oceanfront setback line as clear and objective in *Roberts*, 316 Or App at 307.

LUBA correctly concluded that, in the absence of further definition, the term "structure" in CBMC 17.04.540 is ambiguous. For example, a "retaining wall" that is less than four feet in height may qualify as a "landscape improvement" and is thus excluded from the definition of "structure." CBMC 17.04.540. However, a "retaining wall" that is a "structural support" is an impermissible structure. CBMC 17.04.570; CBMC 17.42.060(A)(9). There are no criteria to determine when a retaining wall less than four feet high is an impermissible "structural support" as opposed to a permissible "landscape improvement" and, therefore, the definition of "structure" is not clear.

No context of which we are aware resolves that ambiguity, nor have the parties provided persuasive legislative history. We therefore agree with LUBA's determination that the definition of "structure," as used in the CBMC, is not clear and objective, in violation of ORS 197.307(4) and ORS 197.831. Because it is not clear and objective, it cannot be applied to bar applicants' proposed development.

Rather than address whether the standard is clear and objective, Haystack argues that the driveway structure does not meet the code's definition of a "retaining wall." However, that argument fails to address the basis for LUBA's decision—that the definition of "structure" contained in CBMC 17.04.540 is unclear. Because Haystack does not address LUBA's decision or reasoning, it fails to demonstrate that LUBA erred. *See Friends of Marion County v. Marion County*, 233 Or App 488, 494-95, 227 P3d 198 (2010) (rejecting assignment of error where the party failed to address LUBA's reasoning and the court otherwise agreed with LUBA's analysis).

In its fourth assignment of error, Haystack contends that LUBA erred in rejecting its argument that applicants' proposed driveway on the public Nenana ROW did not satisfy the city's geologic hazard standards. Specifically, Haystack challenges LUBA's determination that the standards for the development of the public right-of-way must be "clear and objective," and that because the geologic hazard standards are not "objective," the city cannot require that the application comply with them.

The CBMC includes various requirements to ensure that proposed developments, including "the design and location of roads," either eliminate or appropriately minimize geologic hazards. CBMC 17.50.040(A) - (B). The city made an initial finding that those geologic hazard requirements were not met, but despite that finding, the city determined—and LUBA agreed—that the geologic hazard requirements were inapplicable because they were not "clear and objective," ORS 197.307(4). According to the city and LUBA, the requirement that local governments apply "clear and objective" standards applies to the "development of housing," which includes the process of making housing "usable"—such as connecting it to roads.

As discussed above, the statutory mandate that local governments must apply clear and objective standards applies only to "housing" and the "development of housing," so we must determine what the legislature meant by those terms. ORS 197.307(4);[7] ORS 227.175(4)(b)(A);[8] ORS 197.831.[9] On judicial review, Haystack does not assert that the geologic hazard standard is clear and objective; instead, Haystack argues that LUBA should not have applied the "clear and objective" test at all, because the development of a public right-of-way is not "housing" or the "development of housing" and is thus not subject to that requirement. As explained below, we agree.

Whether LUBA correctly construed the scope of Oregon law requiring local governments to apply only "clear and objective" standards to the development of "housing" presents an issue of statutory interpretation. "To assess

---

[7] ORS 197.307(4) (2017) states, in relevant part:

"[A] local government may adopt and apply only clear and objective standards, conditions and procedures regulating the development of housing, included needed housing[.]"

[8] ORS 227.175(4)(b)(A) states, in relevant part:

"A city may not deny an application for a housing development *** if the development complies with clear and objective standards ***."

[9] ORS 197.831 states, in relevant part:

"In a proceeding before the Land Use Board of Appeals or an appellate court that involves an ordinance required to contain clear and objective approval standards *** for housing ***, the local government *** shall demonstrate that the approval standards *** are capable of being imposed only in a clear and objective manner."

petitioner's statutory construction argument, we examine the text and context of ORS 197.307(4) * * * and, to the extent it appears useful, the legislative history. We begin with the statute's text, which is the most persuasive evidence of the legislature's intent." *Warren v. Washington County*, 296 Or App 595, 599, 439 P3d 581, *rev den*, 365 Or 502 (2019) (citation and internal quotation marks omitted).

We must determine what the legislature meant by the terms "housing" and "development of housing." Because the legislature did not define the terms, we give effect to the words' "plain, natural, and ordinary meaning." *DCBS v. Muliro*, 359 Or 736, 746, 380 P3d 270 (2016) (internal quotation marks omitted). We consult the dictionary definition "on the assumption that, if the legislature did not give the term a specialized definition, the dictionary definition reflects the meaning that the legislature would naturally have intended." *Id*. "Housing" is defined as "shelter, lodging," and "dwellings provided for numbers of people or for a community." *LandWatch Lane County v. Lane County*, 330 Or App 468, 471, 544 P3d 428 (2024) (quoting *Webster's Third New Int'l Dictionary* 1097 (unabridged ed 2002)). Those definitions relate to the houses themselves, not to the roads that connect them. By their plain text, the terms "housing" and "development of housing" appear to refer to houses and the process of developing housing, not public roads.

Turning to the statutory context, both ORS 197.307(4) and ORS 227.175(4) include provisions relating unambiguously to housing regulations. For example, those statutes require that local governments apply only clear and objective standards, conditions, and procedures when regulating "the density" and "height" of housing developments. Moreover, ORS 227.175(4) specifically includes a provision requiring that at "least 75 percent of the floor area applied for is reserved for *housing*" with no reference to road development. (Emphasis added.) Indeed, none of Oregon's statutes requiring "clear and objective" standards address the development of roads. Additionally, Oregon's land use system provides separate statewide planning goals for housing and transportation, again indicating to us that housing development and road development are separate and

distinct processes under Oregon law. Statewide Planning Goals 10, 12.

Applicants point to the definition of "development" contained in ORS 227.215 as relevant context to argue that the term "development of housing" applies to vehicular access to residences. ORS 227.215(1) provides:

> "As used in this section, 'development' means a building or mining operation, making a material change in the use or appearance of a structure or land, dividing land into two or more parcels, including partitions and subdivisions ***, and creating or terminating a right of access."

That provision is clear, however, that it applies to the term "development" *as used in* ORS 227.215 to 227.320. The statutes under review in this case are not contained in those sections, so the definition is not applicable. Moreover, that definition applies to the development of "land," rather than the development of housing. *See State ex rel Schrodt v. Jackson County*, 262 Or App 437, 447, 324 P3d 615 (2014) (reviewing ORS 227.215 and explaining that the word "'development' *** encompasses the concept of a change in the use of *land*" (emphasis added)). And the scope of that provision is broader than either party is suggesting and would result in extending the clear and objective standard far beyond "housing" to include "mining operation[s]." ORS 227.215(1).

Relevant legislative history submitted by the parties supports our conclusion. *Gaines*, 346 Or at 166 (court may limit its consideration of legislative history to the information provided by the parties). ORS 197.307 was originally enacted in 1981, to address a concern that "local governments should not be able to use their land use regulations to exclude certain housing types, particularly manufactured housing[.]" *Rogue Vally Assoc. of Realtors v. City of Ashland*, 35 Or LUBA 139, 156 (1998), *aff'd*, 158 Or App 1, 970 P2d 685, *rev den*, 328 Or 594 (1999). The legislature adopted ORS 197.307 to avoid those exclusionary practices and ensure that development of housing was subject to "clear and objective" standards. In 2017, the legislature adopted the most recent provision requiring clear and objective standards, ORS 227.175(4)(b)(A), and amended ORS 197.307, to expand the scope of the requirement from "development of needed

housing," to "development of housing, included needed housing." Or Laws 2017, ch 745, §§ 3, 5. That 2017 amendment to ORS 197.307 continued to focus on the city's ability to regulate *housing* through clear and objective standards. *See Roberts*, 316 Or App at 311 (explaining that the 2017 amendment "was meant to expand application of the existing 'clear and objective' standard to *all housing*" (emphasis added)).

Our conclusion that the legislature did not intend that the "clear and objective" standard apply to public road development—as opposed to houses and driveways—is consistent with the principles of home rule and preemption. Where state legislation impinges upon the local government powers, home rule favors local government. *City of Corvallis v. State of Oregon*, 304 Or App 171, 174-75, 464 P3d 1127 (2020). And where preemption is intended, the legislation must "unambiguously" preempt the city from adopting regulations. *Gunderson, LLC v. City of Portland*, 352 Or 648, 660, 290 P3d 803 (2012). Here, the requirement that local governments apply only "clear and objective" standards to the development of housing does not, as LUBA concluded, extend unambiguously to all governance that relates to making housing usable—including the development of roads. That interpretation goes beyond what ORS 197.307(4) purports to require and is therefore broader than principles of home rule and preemption would support. *See Roberts*, 316 Or App at 325 ("[W]here the legislature has enacted an ambiguous provision that, under one construction, would have the effect of divesting local governments of their ability to regulate in an area *** within local control, *** home-rule principles undercut the argument that the legislature intended the statutory text to have broad meaning.").

Applicants argue that, because vehicular access is necessary to develop and use the dwelling, the development of the public right-of-way falls within the definition of "development of housing." ORS 197.307(4). But, had the legislature clearly intended that local governments apply "clear and objective" standards in reviewing any applications related to make housing *usable*, it could have done so (with the likely effect of regulating areas beyond housing and public road development, such as public utilities). Instead, both the

text and legislative history focused specifically on residential buildings and developments.

Finally, applicants argue that, because the vehicular access proposal was submitted alongside an application for the development of housing, the approval of vehicular access must be subject to the "clear and objective" test applicable to the development of housing. That the vehicular access application was consolidated with the applications for residential development was one basis for LUBA's decision that "clear and objective" standards must be applied to the right-of-way development. However, as LUBA has previously explained, "consolidation is for purposes of procedure, and it does not change the approval criteria applicable to a given application." *Tukwila Development, LLC v. City of Woodburn*, LUBA No. 2021-058, 17-18 (holding that the city erred in applying street standards applicable to subdivision applications to an annexation application, even though the applications were consolidated). We agree with LUBA—the city's decision to combine the housing application with the right-of-way application does not impact our construction of the statute.

We reverse in part and remand for a determination of whether the application for developing Nenana ROW complies with the geologic hazard standard, CBMC 17.50.040. We otherwise affirm.

Reversed in part and remanded.